# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ) | | |
| GERALDINE CAMPFIELD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 15-cv-1507 (KBJ) |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION ADOPTING
## REPORT & RECOMMENDATION OF THE MAGISTRATE JUDGE

Plaintiff Geraldine Campfield applied to the Commissioner of Social Security ("Commissioner" or "Defendant") for disability benefits and supplemental security income benefits in 2012, claiming that she was disabled due to neck and back problems, as well as stiffness in her left hand. (AR, ECF No. 5-3, at 2.)[1] In May of 2014, an Administrative Law Judge ("ALJ") held a hearing on Campfield's application, and ultimately determined that she is not disabled under the Social Security Act. Proceeding pro se, Campfield has filed the instant lawsuit, requesting that this Court reverse the ALJ's denial decision and grant her benefits. (*See generally* Compl., ECF No. 1.)

On September 17, 2015, this Court referred this matter to a Magistrate Judge for full case management. (*See* Min. Order of Sept. 17, 2015.) Five months later, Campfield filed a letter with enclosures in which she asked the Court "to go over my

---

[1] Page numbers herein refer to those that the Court's electronic case filing system automatically assigns.

Medical Records, for the year of 2015; in hopes of ruling in my favor in reference to my current civil case." (Letter from Geraldine Campfield, ECF No. 8, at 1; *see also id.* at 2–50 (attaching additional records regarding her medical condition).) Magistrate Judge G. Michael Harvey construed Campfield's letter as a motion for judgment of reversal or for remand (*see* Min. Order of Feb. 4, 2016; Letter from Geraldine Campfield, ECF No. 9, at 1), and on March, 11, 2016, Defendant filed a motion for affirmance of the ALJ's decision, arguing "that substantial evidence of record supports the conclusion that Plaintiff was not disabled during the relevant period" (Def.'s Mem. in Supp. of Her Mot. for J. of Affirmance & in Opp'n to Pl.'s Mot. for J. of Reversal, ECF No. 10, at 12).

Before this Court at present is the comprehensive Report and Recommendation that Magistrate Judge Harvey has filed regarding Campfield's motion for reversal and Defendant's motion for affirmance. (*See* R. & R., ECF No. 15.)[2] The Report and Recommendation reflects Magistrate Judge Harvey's opinion that Campfield's motion for reversal should be denied, and that Defendant's motion for affirmance should be granted. (*See id.* at 1–2, 42.) Specifically, Magistrate Judge Harvey finds that substantial evidence supports the ALJ's decision that Campfield was not disabled (*see id.* at 25–36), and that the additional evidence that Campfield submitted in the instant proceeding would not have changed the outcome of the underlying action (*see id.* at 36–42.) The Report and Recommendation also advises the parties that the "failure to timely file objections to the findings and recommendations set forth in this report may

---

[2] The Report and Recommendation, which is 43 pages long, is attached hereto as Appendix A.

waive the right of appeal from an order of the District Court adopting such findings and recommendations." (*Id.* 42–43 (citing *Thomas v. Arn*, 474 U.S. 140, 154 (1985)).)

Under this Court's local rules, any party who objects to a Report and Recommendation must file a written objection with the Clerk of the Court within 14 days of the party's receipt of the Report and Recommendation, and any such written objection must specify the portions of the findings and recommendations to which each objection is made and the basis for each such objection. *See* LCvR 73.2(b). On October 19, 2016—well outside of the 14-day window—Campfield filed with the Court a document entitled, "Notice of Material Facts . . . Left Out of My Social Security Claim[,]" to which she attaches a one-page medical record from 2015, and 17 pages of medical records from 2016. (ECF No. 16, at 1; *see also id.* at 2–19.) In addition to being untimely, this filing is not a proper objection to the Report and Recommendation, even under the "less stringent standards" to which federal courts hold pro se litigants, *Haines v. Kerner*, 404 U.S. 519, 520 (1972), because it fails to specify either the portion of the findings and recommendations to which Plaintiff objects or the underlying basis for any such objection. Thus, as of the date of the instant Memorandum Opinion (more than five months after the Report and Recommendation was issued) no proper objections have been filed.

This Court has reviewed Magistrate Judge Harvey's Report and Recommendation and agrees with its careful and thorough analysis and conclusions. In particular, the Court agrees with the Magistrate Judge that substantial evidence supports the ALJ's determinations that none of Campfield's impairments satisfy the requirements of the relevant Social Security regulatory listings (*see* R. & R. at 25–28); that Campfield's residual functioning capacity permits her to perform light work (*see id.* at 28–33); that

Campfield could return to her past work as a mail clerk (*see id.* at 34); and that Campfield could adjust to other work available in the national economy (*see id.* at 34–36).  As a result, this Court concurs with Magistrate Judge Harvey's conclusion that Campfield has "failed to successfully demonstrate that any part of the decision of the administrative law judge . . . was erroneous."  (*Id.* at 1.)

The additional medical documentation that Campfield recently submitted does not provide any basis for rejecting Magistrate Judge Harvey's considered opinion, or for remanding this action to the Commissioner, for at least two reasons.  First, to the extent that some of the records appear to document Campfield's clinical depression, *that* medical condition was not mentioned in Campfield's benefits application, and Magistrate Judge Harvey was correct to observe that Campfield's failure to seek benefits for depression in the underlying administrative proceeding prevents her from doing so now.  (*See id.* at 37; ECF No. 16, at 2–18.)  Second, although the additional medical document regarding Campfield's spine and lower extremities indicates that she may indeed suffer from a qualifying impairment under the relevant Social Security regulations (*see* R. & R. at 38–39; ECF No. 16, at 19), the Magistrate Judge already considered similar documentation, and his Report and Recommendation rightly concludes that this proof falls short of establishing a necessary element of Campfield's claim for benefits; namely, that she "suffers from motor loss, spinal arachnoiditis, or an inability to ambulate effectively" (R. & R. at 40 (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04A–C)).  Consequently, this additional evidence would not have changed the outcome of the administrative proceeding even if it had been submitted below, and

it therefore provides no basis for disturbing either the ALJ's or Magistrate Judge Harvey's ruling. *See Jones v. Astrue*, 647 F.3d 350, 358 (D.C. Cir. 2011).

In sum, in the absence of any timely-filed objections, and after conducting its own review of this matter, this Court accepts Magistrate Judge Harvey's analysis of the ALJ's findings and the record evidence in full, and will **ADOPT** the Report and Recommendation in its entirety. Accordingly, Plaintiff's [8] Motion for Judgment of Reversal will be **DENIED**, and Defendant's [10] Motion for Judgment of Affirmance will be **GRANTED**.

A separate Order accompanies this Memorandum Opinion.

DATE: December 28, 2016

*Ketanji Brown Jackson*
KETANJI BROWN JACKSON
United States District Judge

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| **GERALDINE CAMPFIELD** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 15-cv-1507 (KBJ/GMH)** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **in her official capacity as** | ) | |
| **Acting Commissioner of Social Security** | ) | |
| | ) | |
| **Defendant.** | ) | |

_____)

## REPORT AND RECOMMENDATION

This matter was referred to the undersigned for full case management.  In this action, Plaintiff Geraldine Campfield, proceeding pro se, seeks reversal of a decision of the Commissioner of Social Security denying her benefits pursuant to the Social Security Act, 42 U.S.C. § 405(g).  Before the undersigned are Plaintiff's motion for judgment of reversal and Defendant's motion for judgment of affirmance.  Plaintiff's briefing in support of her motion consists of two letters to the Court with several medical records attached to each.  Neither letter contains any assertions of error or supporting legal arguments.  Plaintiff has therefore failed to successfully demonstrate that any part of the decision of the administrative law judge ("ALJ") was erroneous.  Moreover, having reviewed the administrative record and Plaintiff's additional medical records, the undersigned detects no basis for remand or any reversible error in the ALJ's decision.  Thus, upon review of the entire record,[1] the undersigned recommends that Plaintiff's

---

[1] The relevant docket entries for purposes of this Report and Recommendation are: (1) Plaintiff's Motion for Judgment of Reversal ("Pl. Mot.") [Dkt. 8]; (2) Defendant's Motion for Judgment of Affirmance and Opposition to Plaintiff's Motion for Judgment of Reversal ("Def. Mot.") [Dkt. 10]; (3) Plaintiff's Opposition to Defendant's Motion for Judgment of Affirmance and Reply in Support of Plaintiff's Motion for Judgment of Reversal ("Pl. Reply") [Dkt. 13]; and (4) the Administrative Record ("AR") [Dkt. 5].

motion be denied and Defendant's motion be granted.

# BACKGROUND

## A.     Legal Framework for Social Security Disability Claims

To be eligible for disability benefits under the Social Security Act, a claimant must be found to be disabled by the Social Security Administration ("SSA").  42 U.S.C. § 423(a).  In most cases, to determine whether a claimant is disabled within the meaning of the Act, an ALJ gathers evidence, holds a hearing, takes testimony, and performs a five-step legal evaluation of the claimant using that evidence.  20 C.F.R. § 404.1520.

In that evaluation, the ALJ must determine whether:  (1) the claimant is "presently engaged in substantial gainful activity"; (2) the claimant has a "medically severe impairment or impairments"; (3) the claimant's impairment is equivalent to one of the impairments listed in the appendix of the relevant disability regulation; (4) the impairment prevents the claimant from performing his past relevant work; and (5) the claimant, in light of his age, education, work experience, and residual functioning capacity ("RFC"), can still perform another job that is available in the national economy.  Id.  A claimant's RFC is his ability to perform either past relevant work or any other work available in the national economy.  See Butler v. Barnhart, 353 F.3d 992, 1000 (D.C. Cir. 2004).  According to Social Security Ruling ("SSR") 96-8p, "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities" in a work setting for eight hours per day, five days a week, or an equivalent work schedule.  Titles II & XVI:  Assessing Residual Functional Capacity in Initial Claims, SSR

Appendix A

96-8p, 1996 WL 374184, at *2 (July 2, 1996).[2]   In short, it represents the most a claimant is able

to do notwithstanding his physical or mental limitations.  <u>See</u> <u>Butler</u>, 353 F.3d at 1000.

The claimant bears the burden of proof in the first four steps of the evaluation.  <u>Callahan</u>

<u>v. Astrue</u>, 786 F. Supp. 2d 87, 89 (D.D.C. 2011).  At step five, however, the burden shifts to the

Commissioner to identify specific jobs available in the national economy that the claimant can

perform.  <u>Id.</u>  In making this determination, an ALJ may call a vocational expert ("VE") to testify

as to whether a claimant can perform other work that exists in the national economy.  <u>Id.</u> at 90.

A VE may draw her conclusions from a number of sources, including the Dictionary of

Occupational Titles ("DOT").  <u>Id.</u>  The DOT, last published by the U.S. Department of Labor in

1991, provides a brief description of occupations within the national economy and lists the

capabilities that each occupation requires of a worker.  <u>See</u> <u>generally</u> <u>Introduction</u> to DOT (4th

ed. 1991), <u>available</u> <u>at</u> 1991 WL 645964.  Along with VE testimony, the SSA generally relies on

the DOT to determine if there are jobs in the national economy that a claimant can perform given

his RFC.  <u>See</u> 20 C.F.R. §§ 416.966–416.969.

**B.    Relevant Facts**

1.    <u>Plaintiff Geraldine Campfield</u>

At the time of the alleged onset of her disability, Plaintiff was a 51-year-old woman

residing in the District of Columbia.  AR 19.  She reached the 10th grade in high school and

never acquired a high school equivalent degree.  <u>Id.</u> at 33.  Plaintiff previously worked as a mail

clerk for twelve years.  <u>Id.</u> at 19, 238.[3]

---

[2] The SSA publishes SSRs that "are binding on all components of the Social Security Administration.  These rulings represent precedent[ial] final opinions and orders and statements of policy and interpretations that [the SSA has] adopted."  20 C.F.R. § 402.35(b)(1).

[3] Under the relevant regulations, Plaintiff was considered a "person closely approaching advanced age" with a "limited education" at the commencement of her alleged disability.  <u>See</u> 20 C.F.R. § 416.963–65.

## 2.    Plaintiff's Application for Benefits

On July 13, 2012, Plaintiff filed applications for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act, respectively. Id. at 56.  Plaintiff alleged disability beginning May 8, 2012, due to neck and back problems as well as stiffness in her left hand.  Id.  On August 8, 2012, the Commissioner initially denied Plaintiff's claims, determining that her current symptoms were not severe enough to keep her from working.  Id. at 95.  Plaintiff requested reconsideration of that decision, but the Commissioner again denied her claims on December 5, 2012, citing medical reports that showed her ability to perform some less physically demanding types of work despite her pain in the back, neck, and hand.  Id. at 106.  On February 1, 2013, Plaintiff filed a written request for a hearing, which the Commissioner granted.  Id. at 118–19.  Plaintiff appeared and testified at a hearing held before an ALJ on May 13, 2014.  Id. at 29–54.  On June 25, 2014, the ALJ denied Plaintiff's claims on the grounds that she could return to her past work as a mail clerk and that she was capable of performing "light work" available in the national economy.  Id. at 20.[4]

Plaintiff appealed the ALJ's decision, and on August 3, 2015, the Social Security Appeals Council denied her request for review.  Id. at 1–3.  The ALJ's decision thus became the Commissioner's final decision, see Ryan v. Bentsen, 12 F.3d 245, 247 (D.C. Cir. 1993), and Plaintiff then commenced this action for review of that decision.

---

[4] Light work involves

> lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. . . . [A] job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. . . . If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

Id. § 404.1567(b).

Appendix A

3.      The Administrative Record

An administrative hearing was held in this case before an ALJ.  AR 29–54.  During this

hearing, Plaintiff testified and was represented by counsel.  Id. at 29.  The ALJ evaluated

Plaintiff's symptoms based on evidence in the administrative record, including medical records

and opinions, Plaintiff's statements, and testimony from a VE.  The undersigned recounts the

relevant portions of the administrative record below.

**a.      Dr. Jeff Jacobson – Treating Physician**

On May 8, 2009, Plaintiff underwent an MRI which revealed multi-level cervical

spondylosis, cord flattening, and central stenosis at the C5-C6 vertebra.  Id. at 320.  Plaintiff was

diagnosed with a herniated disc, cervical spondylosis,[5] and cervical myelopathy.[6]  Id. at 696.  On

July 21, 2009, Dr. Jeff Jacobson, a neurologist, performed an anterior cervical discectomy[7] and

fusion at C5-C6 to alleviate Plaintiff's condition.  Id.  During a follow-up evaluation on

September 21, 2009, Dr. Jacobson observed that Plaintiff was recovering adequately.  Id. at 706.[8]

He recommended outpatient physical therapy and "ultimately [felt] that she should be able to

return to the work force."  Id.

---

[5] Spondylosis is an umbrella term referring to various degenerative diseases of the spine – in this case, the problems centered around the cervical region of Plaintiff's spine.  See Merriam-Webster Medical Dictionary, "spondylosis" (rev. ed. 2005), available at http://www.merriam-webster.com/medical/spondylosis (last visited July 15, 2016).

[6] Myelopathy is a disease or disorder of the spinal cord or bone marrow.  See Merriam-Webster Medical Dictionary, "myelopathy" (rev. ed. 2005), available at http://www.merriam-webster.com/dictionary/myelopathy (last visited July 15, 2016).

[7] A discectomy is a surgical procedure to remove a spinal disk.  See Merriam-Webster Medical Dictionary, "-ectomy" (rev. ed. 2005), available at http://www.merriam-webster.com/dictionary/ectomy (last visited July 15, 2016).

[8] In the ALJ's factual determinations, he found that Dr. Jacobson "restrict[ed] [Plaintiff] from lifting and from working in 2009[.]"  AR 18.  A review of the record does not reveal such a restriction by Dr. Jacobson, but the undersigned notes that some restriction may be reasonably inferred from this follow-up evaluation.  See id. at 706.

Appendix A

Plaintiff visited Wanda Evans, a physical therapist, on October 15, 2009, reporting difficulty sleeping due to pain in her neck, shoulder, and right arm. Id. at 418–19. Ms. Evans instructed Plaintiff to perform home exercises, but Plaintiff later reported to Ms. Evans that she did not complete them. Id. at 433. On November 11, 2009, Plaintiff visited Dr. Douglas Vanzoeren with complaints of pain caused by returning to work "too soon." Id. at 430. Plaintiff claimed that her neurologist advised her "not [to] return to work before the end of the year," but her employer found that "the documentation for this was insufficient." Id.

### b.     Drs. Cesar Torres and Mary Rae – Treating Physicians

On April 20, 2012, Plaintiff reported pain in her left shoulder to Dr. Cesar Torres, her primary care physician. Id. at 362. He recommended that Plaintiff rest her shoulder, apply ice to the area, and take over-the-counter pain relievers to manage the pain. Id. at 363. In addition, Dr. Torres instructed Plaintiff to perform range of motion exercises at home and to return to the clinic if her symptoms worsened or failed to improve. Id. Plaintiff returned on May 4, 2012, reporting that her pain persisted and that the over-the-counter medication was unhelpful. Id. at 359. Dr. Torres ordered an X-ray of Plaintiff's shoulder, prescribed a muscle relaxant, and excused her from work until May 7, 2012. Id. at 360, 707. Moreover, Dr. Torres instructed Plaintiff not to use her left shoulder at work before her follow-up appointment on May 18, 2012. See id. at 707.

At the follow-up appointment, an examination of Plaintiff's shoulder revealed signs of impingement syndrome, so Dr. Torres recommended treatment with a steroid injection. Id. at 357–58. Plaintiff declined the injection, preferring medication instead. Id. at 358. Dr. Torres prescribed an anti-inflammatory drug, referred Plaintiff to an orthopedic clinic, and scheduled an

additional follow-up appointment for June 6, 2012.  Id. at 358, 708.  He extended Plaintiff's leave of absence from work until that appointment.  Id. at 708.

On May 25, 2012, Plaintiff visited Dr. Mary Rae, an orthopedic physician assistant, who performed a physical examination of Plaintiff's spine and left arm.  Id. at 301.  This examination revealed tenderness at Plaintiff's left shoulder and neck and slight limitations to her spine's lateral bending and flexion.  Id.  An X-ray also revealed calcification of Plaintiff's distal rotator cuff, but no fracture, dislocation, or other significant degenerative changes.  Id.  Dr. Rae diagnosed Plaintiff with tendinitis in her left shoulder.  Id. at 299.  She recommended a steroid injection, over-the-counter pain relievers, and no left-arm activity.  Id. at 301.  On June 6, 2012, Dr. Rae administered a steroid injection to Plaintiff's left shoulder and told her to return in a few weeks if the symptoms worsened or did not improve.  Id. at 295–96.

That same day, Plaintiff returned to Dr. Torres for her next follow-up appointment.  See id. at 340.  During this visit, Dr. Torres observed that Plaintiff could not "elevate [her] left shoulder to any extent" and doubted the possibility of an extensive recovery.  Id. at 340–41.  He extended Plaintiff's leave of absence until June 15, 2012, for a "final eval[uation] to return to work."  Id. at 341, 710.  During that evaluation, Dr. Torres observed pain and decreased range of motion in her left shoulder.  Id. at 338.  He diagnosed her with a left rotator cuff tear and referred her for an orthopedic specialist consultation.  Id. at 338–39.  Once again, Dr. Torres extended Plaintiff's leave of absence from work until that consultation, which he anticipated would occur on approximately July 6, 2012.  Id. at 712.

On June 21, 2012, Dr. Torres reviewed the results from Plaintiff's left shoulder X-ray, finding evidence of tendinitis but no indications of a full thickness tear in Plaintiff's rotator cuff.  Id. at 388–89. According to the administrative record, Plaintiff did not visit Dr. Torres again

until April 3, 2014.  See id. at 724.  During this visit, Dr. Torres diagnosed Plaintiff with cervical

radiculopathy[9] and spinal stenosis[10] in her cervical spine.  Id.  He instructed Plaintiff to treat

these conditions with two daily doses of morphine.  Id.  Based on her current treatment records,

see infra Part B.6, Plaintiff no longer takes morphine or any other narcotic for pain.

### c.      Dr. Omar Akhtar – Consultative Physician

Plaintiff visited Dr. Omar Akhtar, an orthopedic specialist, on June 20, 2012, pursuant to

Dr. Torres' referral.  Id. at 333.  Plaintiff reported an aching, sharp, stabbing, and throbbing pain

in her left shoulder, which she rated as an 8 out of 10.  Id.  Dr. Akhtar diagnosed Plaintiff with

severe shoulder inflammation and opined that she had "possible nerve irritation in her neck."  Id.

at 713.  He excused her from working for the next six weeks.  Id.  To treat Plaintiff's conditions,

Dr. Akhtar opined that physical therapy would improve her range of motion and that Plaintiff's

cervical spine pain was not causing her shoulder pain.  Id. at 336.  Dr. Akhtar further opined that

Plaintiff "may or may not" benefit from rotator cuff surgery, but he noted concerns regarding

post-operative stiffness if Plaintiff could not improve her range of motion.  Id.  Finally, he

ordered an X-ray and MRI to evaluate Plaintiff's lower cervical spine.  Id.

On June 24, 2012, Dr. Akhtar evaluated Plaintiff's X-ray and MRI results.  Id. at 383,

386.  The X-ray revealed no evidence of a C5-C6 fusion change, or of a fracture or hardware

complication from her surgery on July 21, 2009.  Id. at 386–87.  Plaintiff's MRI showed

---

[9] Radiculopathy is irritation of or injury to a nerve root (as from being compressed) that typically causes pain, numbness, or weakness in the part of the body which is supplied with nerves from that root.  See Merriam-Webster Medical Dictionary, "radiculopathy" (rev. ed. 2005), available at http://www.merriam-webster.com/dictionary/radiculopathy (last visited July 15, 2016).

[10] Spinal stenosis refers to the narrowing of the spinal column that produces pressure on the nerve roots resulting in sciatica and a condition resembling intermittent claudication and that usually occurs in middle or old age.  See Merriam-Webster Medical Dictionary, "spinal stenosis" (rev. ed. 2005), available at http://www.merriam-webster.com/medical/spinal%20stenosis (last visited July 15, 2016).

"[d]egenerative disc disease . . . with up to moderate neural foraminal and minimal central canal stenosis[.]"  <u>Id.</u> at 385.

### d.     Yvette Francis – Physical Therapist

On June 25, 2012, Plaintiff saw Yvette Francis, a physical therapist, claiming to hear a clicking or popping noise in her left shoulder that was accompanied by a burning sensation.  <u>Id.</u> at 330.  Ms. Francis recommended that Plaintiff administer a cold pack to the area for ten or twelve minutes daily.  <u>Id.</u> at 330–31.  She considered Plaintiff "a good rehab candidate," opining that Plaintiff would be able to perform her job-related duties (<u>i.e.</u>, lifting thirty to forty-five pounds of mail matter) within nine or ten physical therapy appointments.  <u>Id.</u> at 331–32.  On July 17, 2012, Plaintiff reported an inability to work, due to weakness in her left side and severe pain that increased by sitting, laying down, or turning her head.  <u>Id.</u> at 323.  Ms. Francis treated Plaintiff's symptoms with a cold pack and noted tenderness and decreased range of motion along Plaintiff's cervical spine.  <u>Id.</u> at 324.  Ms. Francis decided that more therapy sessions were required to determine whether Plaintiff was an "appropriate candidate that can benefit from [physical therapy] services."  <u>Id.</u>

During a session on July 25, 2012, Plaintiff rated her neck pain as a 6 out of 10, which increased when she was active.  <u>Id.</u> at 322.  She was unable to tolerate her neck being touched, so Ms. Francis recommended that Plaintiff visit a pain management center ("PMC").  <u>Id.</u>  Plaintiff returned to Ms. Francis on August 9, 2012, again reporting severe neck pain.  <u>Id.</u> at 510.  She also reported making an appointment with a PMC in late August.  <u>Id.</u>  Ms. Francis determined that Plaintiff was experiencing no improvement from physical therapy and discharged her to the PMC.  <u>Id.</u>

Appendix A

## e.     Drs. Hwei Lin and Vrishali Dalvi – Consultative Physicians

Dr. Torres referred Plaintiff to Dr. Hwei Lin, an anesthesiologist, and on August 22, 2012, Plaintiff reported an aching shoulder pain that worsened by sitting, walking, and lifting. Id. at 505.  She rated her pain as a 9 out of 10.  Id.  Dr. Lin opined that she had adhesive capsulitis of the left shoulder.  Id. at 508.[11]  Dr. Lin recommended a steroid injection, but Plaintiff first wanted to try pain-relieving medications.  Id.  During a later visit on November 27, 2013, Dr. Lin diagnosed Plaintiff with cervical radiculitis.  Id. at 714.[12]

On October 15, 2013, Plaintiff saw Dr. Vrishali Dalvi, a rheumatologist, for knee and back pain.  Id. at 718.  Specifically, Plaintiff reported pain in her right knee and lower back that over-the-counter medications could not alleviate.  Id.  She also reported that she discontinued Dr. Lin's prescribed medications because she believed that some were ineffective and others caused rapid heartbeat and shortness of breath.  Id.  Dr. Dalvi recommended that Plaintiff treat her symptoms by applying capsaicin cream, taking Aleve, and attempting regular exercise.  Id. at 719.  Dr. Dalvi also ordered an MRI of Plaintiff's lumbar spine.  Id. at 722.  That MRI revealed trace disc desiccation[13] and disc bulging at the L3-L4 and L4-L5 vertebra, but the radiologist

---

[11] Adhesive capsulitis, also known as "frozen shoulder," is a condition wherein the shoulder is affected by severe pain, stiffness, and restricted motion.  See Merriam-Webster Medical Dictionary, "frozen shoulder" (rev. ed. 2005), available at http://www.merriam-webster.com/medical/frozen%20shoulder (last visited July 15, 2016).

[12] Radiculitis is an inflammation of a nerve root – here, within the cervical spine.  See Merriam-Webster Medical Dictionary, "radiculitis" (rev. ed. 2005), available at http://www.merriam-webster.com/medical/radiculitis (last visited July 15, 2016).

[13] Like the colloquial definition, the medical definition of desiccation refers to drying up.  See Merriam-Webster Medical Dictionary, "desiccation" (rev. ed. 2005), available at http://www.merriam-webster.com/medical/desiccation (last visited July 15, 2016).

observed no acute fractures or subluxation.[14]  Id. at 723.  He did, however, find multilevel

spondylotic changes at the L4-L5 and L5-S1 vertebra.  Id.

**f.  Drs. Esther Pinder and Alex Hemphill – State Medical Consultants**

Dr. Esther Pinder, an SSA consultative physician, evaluated Plaintiff's initial disability

claim on August 7, 2012, and determined that Plaintiff could occasionally lift twenty pounds,

frequently carry ten pounds, stand or walk for six hours during an eight-hour workday, and sit for

six hours during an eight-hour workday.  Id. at 69.  She also determined that Plaintiff's left arm

could not push, pull, or reach and that she could never climb ladders, ropes, or scaffolds.  Id.  Dr.

Pinder noted that Plaintiff is right-handed, able to drive a car, and able "to do most household

chores."  Id. at 70.  Dr. Pinder ultimately found that Plaintiff was not disabled because the

evidence indicated "no significant muscle weakness or loss control . . . secondary to nerve

damage," Plaintiff could use her right arm "without difficulty," and she could "stand, walk, and

move about."  Id. at 72.  Dr. Pinder opined that Plaintiff could perform "light work."  Id. at 71.

On December 3, 2012, another SSA physician, Dr. Alex Hemphill, evaluated Plaintiff's

disability claim during its reconsideration.  Id. at 82.  Plaintiff reported shortness of breath and

difficulty grooming, dressing, and bathing.  Id. at 76.  Like Dr. Pinder, Dr. Hemphill determined

that Plaintiff could occasionally lift twenty pounds, frequently carry ten pounds, stand or walk

for six hours during an eight-hour workday, and sit for six hours during an eight-hour workday.

Id. at 80.  Dr. Hemphill further agreed with Dr. Pinder's determinations regarding Plaintiff's

degree of mobility, use of her right arm, and lack of muscle weakness.  See id. at 83.  Dr.

Hemphill also found that Plaintiff's impairments precluded her from pushing, pulling, or

---

[14] Subluxation is the partial dislocation of a bone in a joint.  See Merriam-Webster Medical Dictionary, "subluxation" (rev. ed. 2005), available at http://www.merriam-webster.com/medical/subluxation (last visited July 15, 2016).

reaching with her left arm and from climbing ladders, ropes, or scaffolds.  Id. at 80–81.  Like Dr. Pinder, Dr. Hemphill opined that Plaintiff could perform "light work."  Id. at 82.

### g.        Plaintiff's Testimony

On October 2, 2012, Plaintiff stated in her function report, submitted as part of her application for benefits, that she can drive a car, shop at the grocery store twice per month for thirty minutes, and handle her own finances.  Id. at 261.  As for other household activities, Plaintiff reported preparing her own meals twice weekly and ironing her clothes, but she experienced difficulty cleaning her bathroom and dusting.  Id. at 260.  She also reported difficulty taking showers, dressing herself, and putting her hair in a ponytail.  Id. at 259.  Plaintiff represented that she cannot walk more than half a block without resting for ten minutes, that she drops objects when handling them for too long, and that she has problems returning to a standing position after kneeling, bending, and squatting.  Id. at 263.  Plaintiff stated that her "balance isn't good."  Id. at 264.  Finally, Plaintiff claimed that her attention span is "very short."  Id. at 262.

During the administrative hearing, Plaintiff reported that she stopped working on May 8, 2012, due to problems with her back, neck, and left arm.  Id. at 35.  She testified that working as a mail clerk required "writing on forms, checking mail, lifting, [and] pulling cages."  Id. at 34. Plaintiff received long-term disability benefits until February 10, 2014, when she asked Dr. Torres for a note recommending that she could return to work.  Id. at 46–47, 50.[15]  The note, Plaintiff claims, prohibited her from heavy lifting, pushing, and pulling, and restricted her to three hours of work.  Id. at 50.  However, Plaintiff's employer did not permit her to return to work, and she subsequently lost her disability benefits.  Id.  She stated that Dr. Torres prescribed pain medications for her neck problems, which "eases the pain a little," but she is "try[ing] to

---

[15] The ALJ explained that this note did not appear in the administrative record.  AR 18.

wean [her]self off it" without informing Dr. Torres because the medication impairs her ability to focus.  Id. at 37.  Plaintiff stated that the medication was Percocet, though no records indicate that Dr. Torres prescribed Percocet to her.[16]  Plaintiff alleged that the medication's effects lasted up to four hours.  Id. at 48.  According to Plaintiff, she cannot stand longer than twenty minutes, sit longer than thirty minutes, or lift more than ten pounds without excruciating pain.  Id. at 39.  She also reported walking approximately a quarter of a mile approximately three times per week and attending church every Sunday, wherein she must alternate between sitting and standing.  Id. at 46.  She testified that she attended a concert at Constitution Hall on February 14, 2014.  Id.

### h.        The VE's Testimony

At the administrative hearing, the ALJ heard testimony from a VE, who classified Plaintiff's prior work as a mail clerk as light work.  Id. at 50.  The ALJ then asked the VE to identify any jobs in the national economy that would be available to a hypothetical person with physical and mental limitations and a vocational history similar to Plaintiff's.  See id. at 50–51.  The ALJ gave the VE several such hypothetical claimants, each with increasing levels of impairment.

In the first hypothetical, the ALJ described a person who could perform "a full range of light work" and who could frequently balance, stoop, kneel, crouch, crawl, and climb ramps and stairs.  Id. at 51.  This hypothetical person could never climb ropes, ladders, or scaffolds, and this person could only occasionally reach overhead with the left arm.  Id.  In response, the VE stated that such a person would be capable of performing a mail clerk's tasks, as that job is defined in

---

[16] Percocet is a brand name for a narcotic drug that is a combination of acetaminophen and oxycodone and is used to treat moderate to severe pain.  See Mayo Clinic, "Oxycodone and Acetaminophen," available at http://www.mayoclinic.org/drugs-supplements/oxycodone-and-acetaminophen-oral-route/description/drg-20074000 (last visited July 22, 2016).  Both morphine, which Dr. Torres prescribed, and oxycodone, an ingredient in Percocet, are opioids.

the DOT.  Id.  Further, the VE opined that this person could also work as an inspector, ticket taker, or grading and sorting worker, all of which are categorized as light, unskilled jobs.  Id.[17] As a second hypothetical, the ALJ asked the VE to assume an additional limitation:  that this hypothetical person would require the ability to alternate between sitting and standing every thirty minutes.  Id.  The VE stated that such a person could not work as a mail clerk, but the other jobs he had listed would still be available in somewhat reduced numbers.  Id. at 51–52.

Plaintiff, through her attorney, offered additional hypotheticals to the VE.  Id. at 52.  Her first hypothetical described a person with Plaintiff's age, education, and work history who required the ability to sit for thirty minutes before alternating to a standing position for twenty minutes at a time.  Id.  This person could only walk a quarter of a mile.  Id.  Further, this person could lift up to ten pounds with the right arm and up to five pounds with the left arm.  Id.  In response, the VE opined that the light, unskilled jobs he had listed would be available to this person in the same numbers as the person described in the ALJ's second hypothetical.  Id.  In addition to that hypothetical, Plaintiff proposed a further limitation that this person could only focus for thirty minutes before becoming distracted for approximately one hour at a time.  Id. The VE responded that such an individual would be off-task for a greater amount of time than any employer would tolerate.  Id. at 53.

4.    The ALJ's Decision

On June 25, 2014, the ALJ found Plaintiff ineligible for disability benefits.  Id. at 21.  In an eleven-page decision, the ALJ evaluated Plaintiff's conditions based on the above evidence in

---

[17] Unskilled work involves

> little or no judgment to do simple duties that can be learned on the job in a short period of time. . . . [A] person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed.

20 C.F.R. § 416.968(a).

the administrative record.  Id. at 19.  The undersigned recounts the relevant portions of the ALJ's findings below.

### a.      Comparing Plaintiff's Impairments to Appendix Listings

Applying the required five-step process for evaluating disabilities, the ALJ first found that Plaintiff was not engaged in substantial gainful activity since May 8, 2012, the alleged disability onset date.  Id. at 11, 13.  At step two, the ALJ determined that Plaintiff was diagnosed with severe medical impairments in her right knee, cervical spine, lumbar spine, and left shoulder.  Id.[18]

At step three, the ALJ compared Plaintiff's severe medical impairments to ones listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P, finding that none of her impairments met or equaled those listings.  Id.  In light of Plaintiff's specific impairments, the ALJ compared her impairments to listing 1.02, which applies to major joint dysfunctions, and listing 1.04, which applies to disorders of the spine.  Id.  Listing 1.02 is

> [c]haracterized by gross anatomical deformity . . . and chronic joint pain . . . with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02.  For upper extremities, the regulation requires both of the claimant's joints to be affected, id. § 1.02B, and weight-bearing joints, including the knee, must suffer "an extreme limitation of the ability to walk," see id. § 1.00B2b(1).  Listing 1.04 requires, at a minimum, that the claimant's spine disorder compromise a nerve root or the spinal cord.  Id. § 1.04.  In addition, the claimant must present evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis.  Id. § 1.04A–C.

---

[18] Plaintiff's "severe impairments" included:  arthritis of the right knee, degenerative disc disease of the cervical spine with radiculopathy, status-post anterior discectomy and fusion, disc desiccation and bulging of the lumbar spine, and rotator cuff syndrome of the left shoulder.  AR 13.

The ALJ concluded, without explanation, that "the severity of [Plaintiff's] impairments [did] not meet or equal any section of the Social Security listings." AR 14. Since he concluded that none of Plaintiff's impairments met or equaled a pre-defined listing, the ALJ could not conclusively determine at step three whether Plaintiff was disabled. Thus, the ALJ next considered the administrative record to arrive at Plaintiff's RFC. Id.

### b.      Determining Plaintiff's RFC

Examining the objective medical evidence, opinions of physicians, and Plaintiff's testimony, the ALJ determined that Plaintiff's RFC allowed her to perform light work, with the additional caveats that Plaintiff can never push or pull with her left arm, never climb ropes, ladders, or scaffolds, and only occasionally reach overhead with her left arm. Id. at 14. In assessing Plaintiff's subjective reports of pain, the ALJ explained that while Plaintiff's "determinable impairments could reasonably be expected to cause the alleged symptoms[,] . . . [Plaintiff's] statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible[.]" Id. at 15. The ALJ further stated that "[Plaintiff's] conditions do not so severely limit [her] exertional activities to render her disabled." Id.

The ALJ first noted that Plaintiff's treatment "has largely consisted of conservative medical care" since her alleged onset date. Id. at 18. He highlighted Plaintiff's anterior discectomy and fusion of the cervical spine from July 21, 2009, noting that she returned to work after the procedure and that subsequent medical analyses only found "relatively mild" abnormalities in her cervical spine. Id. at 18, 706. The ALJ also noted Plaintiff's rotator cuff tear and tendinitis in her left shoulder, but he emphasized that her physicians "determined that she was not a surgical candidate and prescribed her conservative medication management and physical therapy." Id. at 18, 336, 360, 508. He further emphasized that Dr. Dalvi's treatment

notes "recommended weight loss and exercise" to treat Plaintiff's right knee, rather than a decrease in physical activity. Id. at 18, 719.

Next, the ALJ accounted for the medical reports from Drs. Torres, Ahktar, and Jacobson, which restricted Plaintiff's level of work during finite periods. Id. at 18, 706–08, 712–13. The ALJ found that these excused absences from work "were short term, restricting [Plaintiff's] work activity for periods ranging from a few days to weeks." Id. at 18. The ALJ found that Plaintiff's medical records did not support a permanent restriction and that her treatments did not "warrant precluding [Plaintiff] from all activity." Id. He also observed that multiple physicians recommended exercise to treat Plaintiff's conditions, which did not support her allegations "of severe and ongoing restriction in daily activities due to her conditions." Id. at 18, 363, 433, 719. The ALJ emphasized that Plaintiff independently terminated her prescriptions and over-the-counter medications because she either deemed them to be ineffective or perceived adverse side effects. Id. at 18, 39, 718.

The ALJ assigned "significant weight" to the medical opinions of Drs. Hemphill and Pinder, the State agency medical consultants, because "their opinions [were] well supported by the objective record as a whole." Id. at 19. Both doctors determined that Plaintiff was capable of performing light work. Id. at 71, 82. The ALJ stated that he "carefully reviewed" their opinions and considered their evidence in accordance with SSR 96-6p. Id. at 19; see SSR 96-6p, 1996 WL 374180, at *1 (July 2, 1996) (discussing requirement for the ALJ to consider factual findings by State agency medical consultants as "expert opinion evidence of non-examining sources").

As for Plaintiff's representations, the ALJ determined that her statements were "not entirely supported by the record as a whole, and are only partially credible." AR 19. In reaching

this decision, the ALJ considered both Plaintiff's hearing testimony and her function report.  Id.

at 18.  The ALJ noted Plaintiff's reports of severe limitations regarding her mental concentration

and ability to perform physical activities.  Id. at 18, 37–39, 259–63.  He concluded that these

reports were not supported by Plaintiff's objective medical records or her physicians' treatment

recommendations.  Id.  Additionally, he found that "the objective evidence does not indicate"

that Dr. Torres restricted her to work which excluded heavy lifting, pushing, pulling, and over

three hours of activity.  Id. at 18–19, 50.  Although Plaintiff claimed that Dr. Torres issued a note

to her with these restrictions, Dr. Torres' alleged note cannot be found in the record.  Another

note from Dr. Torres restricted Plaintiff for two weeks from lifting only.  Id. at 707.  The ALJ

acknowledged Plaintiff's morphine prescription from April 3, 2014, id. at 724, but he stated that

her records "show[ed] that prior to this point her treatment . . . was largely conservative."  Id. at

19.  Following these findings, the ALJ concluded that Plaintiff possessed the RFC to

> perform light work[,] . . . except she can never push and pull with the left upper
> extremity.  [Plaintiff] can occasionally reach overhead with the left upper
> extremity.  She should never climb ladders, ropes, and scaffolds.  [Plaintiff] can
> frequently climb stairs and ramps, balance, stoop, kneel, crouch, and crawl.

Id. at 14.

### c.      Finding That Plaintiff Could Return to Past Relevant Work

After determining that Plaintiff's RFC limited her to light work, the ALJ proceeded to

step four of his analysis.  Id. at 19.  He evaluated Plaintiff's residual capability to perform her

past work as a mail clerk and concluded, based on the DOT and testimony from the VE, that

Plaintiff retained substantial capability to perform that previous job.  Id.  Therefore, the ALJ

found that Plaintiff was not disabled under step four.  Id.

### d.      Finding That Plaintiff Could Adjust to Other Work

Proceeding to step five in the alternative, the ALJ examined whether Plaintiff could perform other light work available in the national economy in light of her age, education, work experience, and RFC.  Id.  In reaching his decision, the ALJ again relied on the DOT and testimony by the VE.  Id. at 20.  The VE testified that Plaintiff's physical and mental capabilities would satisfy the requirements for employment as an inspector, ticket taker, or grading and sorting worker.  Id. at 51.  The ALJ therefore found that Plaintiff was also not disabled under step five.  Id. at 20.

### 5.      Plaintiff's Complaint in the District Court

Proceeding pro se, Plaintiff commenced this action in this Court under 42 U.S.C. § 405(g), seeking review of the Commissioner's denial of her claims for disability insurance benefits and supplemental security income.  She appears to request that the Court reverse the Commissioner's decision or, in the alternative, issue an order remanding the case to the Commissioner for a new administrative hearing.  See Pl. Mot. at 1.

### 6.      Plaintiff's Additional Evidence

Accompanying Plaintiff's motion and reply letters were additional medical records which post-date the ALJ's decision from June 25, 2014.  See id.; Pl. Reply at 3.  The records include additional information regarding Plaintiff's right foot, cervical spine, and lumbar spine impairments, as well as other medical conditions.  Pl. Mot. at 2, 4, 10, 20, 28, 31, 34; Pl. Reply at 3.  She explained that difficulties in acquiring medical insurance delayed the completion of her medical treatments, which delayed the submission of these medical records to both the ALJ and her attorney.  Pl. Mot. at 1.

Appendix A

**a.      Drs. Kirk Geter and Janaki Kalyanam – Treating Physicians**

On June 22, 2015, Plaintiff saw Dr. Kirk Geter to treat her foot pain. Id. at 2.  She reported pain, swelling, and numbness in her right foot. Id.  Dr. Geter observed an abnormal range of motion in Plaintiff's ankle and that she used a cane to ambulate. Id. at 5.  Dr. Geter ordered a bilateral foot X-ray, which found no fracture, dislocation, or acute bony abnormalities. Id. at 6, 16.  Plaintiff also visited Dr. Janaki Kalyanam with complaints of foot pain on July 6, 2015. Id. at 7.  During that visit, she reported radiating foot pain which led to stiffness, difficulty bearing weight or ambulating, and additional pain in her right thigh. Id.  Dr. Kalyanam observed no visible deformities and recommended physical therapy and a nerve conduction study ("NCS"). Id. at 7, 9.  The NCS found nerve root irritation on the left side of Plaintiff's L5 vertebrae. Id. at 11.

During Plaintiff's follow-up with Dr. Kalyanam on July 8, 2015, Plaintiff again reported radiating pain in her right foot, as well as pain in her lower back. Id. at 10.  She rated the pain as a 10 out of 10 which she claimed would worsen while sitting, lifting, bending, or lying down. Id. Dr. Kalyanam made no treatment recommendations but assessed Plaintiff for bilateral leg paresthesia. Id. at 11.[19]  On July 14, 2015, Plaintiff returned to Dr. Geter with similar reports of pain, swelling, and numbness in her right foot. Id. at 14.  Dr. Geter noted 5 out of 5 muscle strength in all of Plaintiff's muscle groups, but he recommended surgery and another NCS, depending on the results of a future consultation visit. Id. at 18.[20]

---

[19] Paresthesia involves a sensation of pricking, tingling, or creeping on the skin that has no objective cause. See Merriam-Webster Medical Dictionary, "paresthesia" (rev. ed. 2005), available at http://www.merriam-webster.com/dictionary/paresthesia (last visited July 15, 2016).

[20] Plaintiff's additional medical records do not reveal the nature of this consultation nor the visit's results.

**b.      Drs. Kandie Tate and Kermit Crowder – Treating Physicians**

On August 27, 2015, Plaintiff saw Dr. Kandie Tate, who was listed as her primary care physician, with reports of leg and lower back pain.  Id. at 20.  She also reported a worsening mood due to "her inability to work."  Id.  Dr. Tate noted Plaintiff's potential depression, but Plaintiff declined to discuss treatments.  Id. at 21–22.  Regarding Plaintiff's purported leg and back pain, Dr. Tate referred her to a neurologist for a peripheral neuropathy evaluation.  Id.  On August 31, 2015, Plaintiff saw Dr. Roger Weir, a neurologist, for that evaluation.  Id. at 26.  Dr. Weir observed that Plaintiff had a gradual onset of mild limping and that her "[s]ymptoms [were] worsening."  Id.  He ordered CT examinations of Plaintiff's cervical and lumbar spinal columns.  Id. at 30.

Dr. Kermit Crowder, a radiologist, reviewed the CT exams on September 21, 2015.  Id. at 28–29.  He believed that Plaintiff's cervical-spine examination suggested multilevel cervical spondylosis at the C3-C4 and C5-C6 vertebra, but that an MRI would provide "more definitive" results.  Id. at 28.  This examination also revealed posterior disc bulging and disc osteophyte complexes at multiple levels, but most pronounced at the C4-C5 and C5-C6 vertebra.  Id.  Dr. Crowder found no acute fracture or subluxation at Plaintiff's cervical or lumbar spinal columns.  Id. at 28–29.  For Plaintiff's lumbar-spine examination, Dr. Crowder found mild spondylosis which was most pronounced at the facets of her L4-L5 vertebra, but there was no central canal or neuroforaminal narrowing.  Id. at 29.

**c.      Dr. Peter Whitesell – Consultative Physician**

During a visit with Dr. Tate on December 10, 2015, Plaintiff reported "waking up with the inability to move," which she claimed was accompanied by shortness of breath and leg pain.  Id. at 44.  Dr. Tate assessed Plaintiff for deep venous thrombosis but found no blood clots in her

leg.  Id. at 43.  She referred Plaintiff to a specialist for further treatment.  Id. at 46.  Plaintiff saw

Dr. Peter Whitesell, a sleep disorder specialist, on January 7, 2016.  Id. at 47.  Plaintiff reported

her sleep disorder manifested two years earlier and had since occurred approximately twenty

times each year.  Id.  Dr. Whitesell ordered a pulmonary function test ("PFT") with

bronchodilation to evaluate Plaintiff's lungs.  See id. at 50.  He discussed potential causes of

sleep paralysis and that Plaintiff's shortness of breath could be symptomatic of asthma.  Id.  Dr.

Whitesell opined that if Plaintiff's PFT returned normal results, she could begin exercise to treat

her symptoms.  Id.  These results were not included in Plaintiff's additional medical records.

### d.      Dr. Jennifer Landrette – Consultative Psychologist

On September 8, 2015, Dr. Tate performed a depression screening for Plaintiff because

she had reported a depressed mood, feelings of failure, poor concentration, insomnia, and losing

interest in daily activities.  Id. at 31.  At the conclusion of the screening, Dr. Tate assessed

Plaintiff with moderate depression and referred her to a psychiatric specialist.  Id. at 32–33.

Plaintiff met with Dr. Jennifer Landrette, a psychologist, on January 28, 2016, for an initial

psychological evaluation.  Pl. Reply at 3.  She reported feeling frightened and sad due to losing

her job, and she further represented poor concentration, feelings of guilt, and an increased

appetite.  Id.  Dr. Landrette observed that Plaintiff walks with a limp, but she found that Plaintiff

possessed "fair concentration" and a "good short-term memory."  Id. at 4.  She diagnosed

Plaintiff with major depressive disorder and prescribed Cymbalta for treatment.  Id.

On February 11, 2016, Plaintiff told Dr. Landrette that she voluntarily discontinued

Cymbalta due to gastrointestinal distress and headaches.  Id. at 5.  Dr. Landrette informed

Plaintiff that those symptoms would cease after a few weeks, but she refused to continue the

treatment.  Id.  She also reported difficulty sleeping, an inconsistent appetite, and that her

depression had persisted.  Id.  Dr. Landrette discontinued Plaintiff's Cymbalta prescription and

replaced it with Effexor, another anti-depressant.  Id. at 6.  She also counseled Plaintiff regarding

healthy eating habits and the values of a low-cholesterol diet.  Id.  On March 15, 2016, Plaintiff

returned to the clinic, reporting only minimal stomach discomfort while on Effexor.  Id. at 7. In

light of that information, Plaintiff's Effexor dosage was increased.  Id.

Throughout the period of treatment described in Plaintiff's newly submitted records,

spanning approximately June 2015 to March 2016, those records do not indicate that she was

taking any narcotic pain relievers.  The only pain relievers listed in those records are non-

narcotic medications – gabapentin and cyclobenzaprine.  See Pl. Mot. at 45.[21]

## LEGAL STANDARD

A district court has jurisdiction over a civil case challenging a final disability decision of

the Commissioner.  42 U.S.C. § 405(g).  The court has the authority to reverse or remand the

Commissioner's decision if it is neither supported by substantial evidence nor made in

accordance with applicable law or regulations.  See Richardson v. Perales, 402 U.S. 389, 401

(1971); Simms v. Sullivan, 877 F.2d 1047, 1047 (D.C. Cir. 1989).  Substantial evidence is "such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

Richardson, 402 U.S. at 401 (citation and quotation marks omitted).  Substantial evidence

requires "more than a mere scintilla of evidence, but can be satisfied by something less than a

preponderance of the evidence."  Fla. Mun. Power Agency v. Fed. Energy Regulatory Comm'n,

315 F.3d 362, 365–66 (D.C. Cir. 2003).  The reviewing court must also determine whether the

---

[21] Gabapentin is an anticonvulsant used to treat seizures, nerve pain, and restless legs syndrome.  See Merriam-Webster Medical Dictionary, "gabapentin" (rev. ed. 2005), available at http://www.merriam-webster.com/medical/gabapentin (last visited July 15, 2016).  Cyclobenzaprine is "a skeletal muscle relaxant administered . . . to relieve muscle spasms and pain."  See Merriam-Webster Medical Dictionary, "cyclobenzaprine" (rev. ed. 2005), available at http://www.merriam-webster.com/medical/cyclobenzaprine (last visited July 15, 2016).

ALJ "'has analyzed all evidence and has sufficiently explained that weight he has given to

obviously probative exhibits.'"  Simms, 877 F.2d at 1050 (quoting Stewart v. Sec'y of HEW,

714 F.2d 287, 290 (3d Cir. 1983)).

The district court's role is not to reweigh the evidence but only to determine whether the

ALJ's findings are based on substantial evidence and a correct interpretation of the law.  Butler,

353 F.3d at 999.  The plaintiff bears the burden to prove that the Commissioner's decision is not

supported by substantial evidence.  Callahan, 786 F. Supp. 2d at 93; Brown v. Barnhart, 408 F.

Supp. 2d 28, 31 (D.D.C. 2006).  The D.C. Circuit has instructed that "[i]f the case is one that

involves the taking of additional evidence for any reason, the district court is obligated to obtain

an enhancement or revision of the record by way of remand to the [Commissioner]" rather than

outright reversal.  Callahan, 786 F. Supp. 2d at 93 (quoting Ignoia v. Califano, 568 F.2d 1383,

1389 (D.C. Cir. 1977)).

## DISCUSSION

In the present case, Plaintiff makes no legal argument to contest the ALJ's

determinations.  However, the Court applies special latitude to a pro se plaintiff's filings.  See,

e.g., Toolasprashad v. Bureau of Prisons, 286 F.3d 576, 583 (D.C. Cir. 2002); Scott v. Astrue,

839 F. Supp. 2d 204, 211 (D.D.C. 2012).  Plaintiff's submissions to this Court, read generously,

proffer two arguments for reversing the Commissioner's decision.  First, Plaintiff appears to

assert that the ALJ's findings were not supported by substantial evidence.  Second, Plaintiff

appears to request remand for consideration of the medical records attached to her letters.  See

Pl. Mot. at 1; Pl. Reply at 3.  The undersigned will address these arguments below, bearing in

mind that the court's role when reviewing the Commissioner's disability decisions is "not to

determine . . . whether [Plaintiff] is disabled," but to "assess only whether the ALJ's finding that

[Plaintiff] is not [disabled] is based on substantial evidence and a correct application of the law."

Butler, 353 F.3d at 999.

### A.      Substantial Evidence Supports the ALJ's Disability Determination

To assess Plaintiff's challenge that the ALJ's ultimate decision was not supported by substantial evidence, the undersigned will evaluate each of the ALJ's adverse findings.  The ALJ made decisions adverse to Plaintiff at step three, four, and five of his analysis and during his RFC determination.  The undersigned finds that substantial evidence supports each of these determinations.

### 1.      The ALJ's Finding that Plaintiff's Severe Impairments Did Not Meet the Social Security Listings

In his decision, the ALJ compared Plaintiff's physical impairments with the relevant listings in the appendix to the Social Security disability regulations and determined that none of Plaintiff's conditions meet or equal those listings.  Although the ALJ offered only cursory analysis at this step of his decision, see AR 14, the undersigned cannot conclude that reversal is warranted.

First, Plaintiff's left shoulder impairment does not meet or equal listing 1.02, which requires a claimant's upper joint impairments to affect both extremities.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00B2c.  Plaintiff's rotator cuff syndrome only affected one upper extremity – her left shoulder.  AR 338–39.  Thus, substantial evidence supports the ALJ's conclusion that Plaintiff's shoulder injury does not equal listing 1.02.  Id. at 14; see Tripp v. Astrue, 864 F. Supp. 2d 120, 125 (D.D.C. 2012) (finding that medical evidence and the plaintiff's representations supported the conclusion that his right wrist laceration did not meet or equal listing 1.02 because the severe impairment was "limited to one upper extremity").

Similarly, Plaintiff's right knee impairment does not meet or equal listing 1.02, which requires impairments to weight-bearing joints to present "an extreme limitation of the ability to walk" in order to render a claimant disabled.  See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00B2b(1).  Yet both Plaintiff's testimony and her physician's recommendations show that her knee arthritis did not limit her ability to walk, AR 46 (Plaintiff reporting that she walks a quarter of a mile three times per week), 719 (Dr. Dalvi recommending exercise to treat Plaintiff's knee pain), and the State agency medical consultants both found that she could "stand, walk, and move about," id. at 72, 83.  As a result, substantial evidence also supports the ALJ's conclusion that Plaintiff's right knee impairments do not equal listing 1.02.  See id. at 14.

Finally, Plaintiff's spinal impairments do not meet or equal listing 1.04.  Id. at 14.  Plaintiff's severe spinal impairments included:  (1) degenerative disc disease of the cervical spine with radiculopathy, (2) status-post anterior discectomy and fusion, and (3) disc desiccation and bulging of the lumbar spine.  AR 13, 385, 696, 723.  Listing 1.04 first requires a claimant's spinal disorders to compromise either a nerve root or the spinal cord.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04.  According to Plaintiff's MRI results from June 24, 2012, which displayed "up to moderate neural foraminal and minimal central canal stenosis," her impairments may not have compromised her nerve root or spinal cord.  AR 385; see Morris v. Astrue, No. 3:08–CV–77, 2009 WL 399447, at *4 (E.D. Tenn. Feb. 18, 2009) (upholding an ALJ's step-three findings when the plaintiff's MRI showed "'only mild neural foraminal [stenosis]'" because that did not satisfy the threshold requirement for listing 1.04).  The ALJ failed to elucidate why Plaintiff's impairments did not satisfy this threshold requirement, however.  See AR 14.  The undersigned will therefore consider the listing's additional requirements.  See also Morris v. Colvin, No. 1:15-cv-00193-TWP-TAB, 2016 WL 1057046, at *8 (S.D. Ind. Mar. 17, 2016) (using the ALJ's

consideration of medical evidence in other areas of his decision to assist judicial review of his

step-three findings).  Those additional requirements are:

> A.  Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or

> B.  Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or

> C.  Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04A–C.  Thus, in order to fully satisfy listing 1.04, the

regulation requires, in addition to compromise of a nerve root or the spinal cord, that one of the

three circumstances above be present.  Id.

Even assuming that Plaintiff's impairments meet the threshold requirement of listing

1.04, none of the record evidence establishes that Plaintiff's cervical or lumbar spinal

impairments satisfy any subpart of 1.04.  The State agency medical consultants, whom the ALJ

accorded "substantial weight" during his RFC determination, both found "no significant muscle

weakness or loss control . . . secondary to nerve damage" upon consideration of Plaintiff's spinal

impairments.  AR 19, 72, 83; see also Carnett v. Colvin, 82 F. Supp. 3d 1, 14 (D.D.C. 2015)

(emphasizing that an ALJ's step-three finding was supported by two State agency medical

consultants who determined that the plaintiff's impairments did not meet listings 1.02 or 1.04).

Substantial evidence therefore supports the conclusion that Plaintiff lacks sufficient motor loss to

satisfy listing 1.04A without evidence of muscle weakness in her spine.  Moreover, the record

lacks evidence that Plaintiff ever received a "positive straight-leg raising test (sitting and supine)" as listing 1.04A requires.  See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04A.  The record also lacks evidence that Plaintiff was diagnosed with spinal arachnoiditis, which is essential for listing 1.04B.  See id. § 1.04B.  Additionally, as discussed above, both Plaintiff's testimony and medical opinions in the record contradict the notion that she was unable to ambulate effectively, which is a basic requirement for listing 1.04C.  See id. § 1.04C; AR 46, 72, 83, 719; see also Morris, 2016 WL 1057046, at *8 ("The record supports the ALJ's decision that there was insufficient evidence to establish the criteria and subcriteria for Listings 1.04(A), (B), and (C).").  Accordingly, the ALJ's step-three conclusions are supported by substantial evidence.

2.     The ALJ's Determination that Plaintiff's RFC Permits Light Work

Substantial evidence also supports the ALJ's conclusion that Plaintiff's RFC permitted her to perform light work.  To determine a claimant's RFC, the ALJ must consider objective medical evidence, medical opinions, and statements from the claimant.  20 C.F.R. § 416.929(c)(1).  A claimant's statements "may not be disregarded solely because they are not substantiated by objective medical evidence."  SSR 96-7p, 1996 WL 374186, at *1.  Instead, the ALJ must assess the claimant's credibility based on the entire record, including her own previous representations of pain and the extent by which her pain can be controlled with treatment. Hartline v. Astrue, 605 F. Supp. 2d 194, 206 (D.D.C. 2009); Pinkney v. Astrue, 675 F. Supp. 2d 9, 21 (D.D.C. 2009).  A review of the record demonstrates that the ALJ properly considered objective medical evidence and opinions from medical experts in reaching his decision, and he had a sufficient basis on which to discount Plaintiff's subjective complaints.  See AR 14–19.

The ALJ first considered extensive medical records regarding Plaintiff's knee, spine, and shoulder to compile his RFC assessment, noting the conservative treatments for each

impairment.  See id. at 15; see also Lee v. Barnhart, 214 F. App'x 660, 661 (9th Cir. 2006)

("[T]he medical evidence . . . supported the [ALJ's] determination that [the plaintiff] was not

disabled . . . because he suffered from an impairment that improved

with conservative treatment[.]").  Indeed, Dr. Dalvi recommended over-the-counter pain

relievers and exercise to treat Plaintiff's knee, AR 719, Drs. Akhtar and Torres recommended

physical therapy and muscle relaxants, respectively, to treat Plaintiff's shoulder, id. at 336, 360,

and Ms. Francis treated Plaintiff's back pain with cold packs and home exercises.  Id. at 324.

　　　　The ALJ's RFC finding was further supported by the medical opinions of Drs. Pinder and

Hemphill, the State agency medical consultants, who both determined that Plaintiff's physical

limitations would allow the performance of light work.  Id. at 71, 82.  Dr. Pinder reached her

conclusion after noting that Plaintiff could freely ambulate, drive a car, and complete household

chores, id. at 70–72, and Dr. Hemphill certified Dr. Pinder's opinion, finding that Plaintiff could

occasionally lift twenty pounds, frequently lift ten pounds, and stand, walk, or sit for six hours

during a traditional workday, all of which support an RFC for light work.  See 20 C.F.R. §

404.1567(b); AR 80.

　　　　The undersigned also finds that the ALJ appropriately found Plaintiff less credible in

light of the inconsistency between her representations and the record.  See Pinkney, 675 F. Supp.

2d at 21.  In his analysis, the ALJ determined that Plaintiff's statements were "not entirely

supported by the record as a whole, and [were] only partially credible."  AR 19.  Plaintiff

represented in her function report that she has difficulty completing household tasks, such as

bathing and dressing herself, and that she has problems returning to a standing position.  Id. at

263.  During the administrative hearing, Plaintiff testified that she cannot stand longer than

twenty minutes, sit longer than thirty minutes, or lift more than ten pounds without excruciating

pain.  Id. at 39.  These representations were contradicted by the opinions of Drs. Pinder and

Hemphill, noted above, who both found that Plaintiff was capable of substantially more physical

exertion.  See id. at 71, 80.

Plaintiff's testimony regarding the extent of her daily activities further diminished her

purported limitations.  See Espinosa v. Colvin, 953 F. Supp. 2d 25, 34 (D.D.C. 2013) (analyzing

the credibility of a plaintiff's subjective representations against his own statements regarding

daily activities); Grant v. Astrue, 857 F. Supp. 2d 146, 156 (D.D.C. 2012) (finding that ALJ

properly considered claimant's reports of daily activities when assessing claimant's complaints

of pain).  Plaintiff stated in her function report that she could drive a car, shop at the grocery

store, iron her clothes, and prepare her own meals.  AR 260–61.  The ALJ acknowledged

Plaintiff's reported physical and mental limitations, id. at 37–39, 259–63, but found that

"[Plaintiff's] medical treatment, physical examinations[,] and recommendations for care [did] not

support" those limitations.  Id. at 18; see Payne v. Shalala, No. 93–0288 (NHJ), 1993 WL

405747, at *3 (D.D.C. Sept. 24, 1993) (finding substantial evidence supported an ALJ's

disability determination when he considered both objective medical evidence and evidence from

the plaintiff's daily routine).

Plaintiff's generally conservative treatments provided additional support for the ALJ's

credibility determination.  See Parra v. Astrue, 481 F.3d 742, 751 (9th Cir. 2007) ("[E]vidence of

conservative treatment is sufficient to discount a claimant's testimony regarding severity of an

impairment.") (internal quotation marks omitted); Hartline, 605 F. Supp. 2d at 206 (finding ALJ

appropriately considered claimant's complaints "to be only fair at best" when ALJ noted, among

other factors, the effectiveness of medication in alleviating claimant's symptoms).  Plaintiff

asserted that Dr. Torres restricted her to work which excluded heavy lifting, pushing, pulling,

and over three hours of activity, AR 50, but the ALJ found that "the objective evidence does not indicate such restrictions were recommended," id. at 18–19.  The evidence instead revealed conservative treatments, discussed above, including over-the-counter pain relievers, exercise, and physical therapy.  See id. at 324, 336, 360, 719; see also Youmans v. Astrue, 856 F. Supp. 2d 218, 222 (D.D.C. 2012) (distinguishing conservative treatments, such as a prescription inhaler, from non-conservative treatments, such as surgery).

The only treatment that on its face appears non-conservative is Plaintiff's morphine prescription from April 3, 2014.  AR 724.  The ALJ distinguished this treatment, stating that Plaintiff's records "show[ed] that prior to this point her treatment . . . was largely conservative," id. at 19.  It is true that morphine is a powerful narcotic painkiller and is generally viewed as non-conservative treatment.  See Durham v. Colvin, Case No. CV 15-00567-RAO, 2015 WL 9305627, at *11 (C.D. Cal. Dec. 21, 2015).  Some courts, however, distinguish instances of infrequent or short-term narcotic usage with long-term prescriptions that are coupled with a larger plan of non-conservative treatment.  Id.  In the latter case, "the claimants typically used narcotic medications in conjunction with other treatments which were also not conservative." Id.; see also Hanes v. Colvin, No. 14-16055, 2016 WL 3212172, at *2 (9th Cir. June 10, 2016) (rejecting ALJ's conclusion that "high doses of a variety of powerful narcotic painkillers (including Opana, Fentanyl, and morphine)," coupled with "spinal injections and radiofrequency ablation," constituted conservative treatment).  By contrast, "[t]he use of narcotic medication, by itself, may be considered conservative treatment."  Durham, 2015 WL 9305627, at *11; Purnell v. Astrue, 662 F. Supp. 2d 402, 410 (E.D. Pa. 2009) ("[T]he use of a commonly prescribed pain medication, even a narcotic, does not remove [claimant's] treatment from the realm of conservative treatment.").

Appendix A

Here, the record shows a single instance of a narcotic prescription, i.e., morphine, in April 2014, just prior to the administrative hearing.  AR 724.  The record also shows that, at least around the time of the May 2014 administrative hearing, Plaintiff was taking another narcotic, Percocet.  See id. at 38.[22]  But Plaintiff's new medicals records, which date from June 2015 to March 2016, do not contain any prescription for any narcotic medication, nor does any physician mentioned in those records prescribe one.  It seems Plaintiff was prescribed one or two painkillers, but none is a narcotic.  Further, there is no record evidence that Plaintiff's treatment with narcotics at or around the time of the administrative hearing was couple with any other non-conservative treatment.  Thus, the record undermines any claim that Plaintiff's use of morphine was anything more than an isolated, short-term treatment for pain.  This lack of evidence supports the ALJ's view that the morphine prescription, standing alone, was conservative treatment.  See Durham, 2015 WL 9305627, at *11; Buford, 2015 WL 4403071, at *4.

In this way, this case mirrors Higinio v. Colvin, No. EDCV 12–1820 AJW, 2014 WL 47935, at *5 (C.D. Cal. Jan. 7, 2014).  There, the court upheld the ALJ's credibility determination against the plaintiff's challenge that the ALJ had improperly disregarded her narcotic treatments.  Id.  Although the record showed that the plaintiff had taken some narcotics, including Vicodin, in the past, "[p]laintiff [had] not pointed to evidence in the record documenting who prescribed [the narcotics], for how long, or the indications for prescribing those medications."  Id.  Thus, the court reasoned, "[t]he fact that plaintiff may have been prescribed [a narcotic] at some point . . . does not negate the reasonableness of the ALJ's

---

[22] As noted above, Plaintiff stated during her testimony before the ALJ that she was taking Percocet.  AR 38.  There are no records or other evidence showing that she was ever prescribed Percocet instead of, or in addition to, morphine.  In any event, both are similar opioid medications.

inference that her treatment as a whole during the relevant period . . . was conservative and routine." Id.

Here, much like Higinio, the Court has no evidence other than the lone 2014 morphine prescription that Plaintiff ever took a narcotic drug to treat her pain. This isolated instance is not enough to warrant reversal. See also Buford v. Colvin, CASE NO. 3:14CV00295–BD, 2015 WL 4403071, at *4 (E.D. Ark. July 20, 2015) (finding that ALJ properly rejected claimant's complaints of pain when record showed only two instances of use of narcotic pain relievers). Moreover, even if Plaintiff continued to take morphine to this day, it would not be part of a constellation of ongoing, non-conservative treatments. The use of morphine does not itself mandate the conclusion that Plaintiff's treatments were non-conservative, and the Court finds substantial evidence in the record supporting the ALJ's decision to the contrary. Durham, 2015 WL 9305627, at *11; Purnell, 662 F. Supp. 2d at 410.

Moreover, the record indicates that Plaintiff unilaterally discontinued her medication on multiple occasions. See Youmans, 856 F. Supp. 2d at 222 (upholding an ALJ's consideration of the plaintiff's history of "not taking medications or seeking follow-up treatment"). At the administrative hearing, Plaintiff testified that she was "try[ing] to wean [her]self off" of her narcotic pain reliever without consulting Dr. Torres, AR 37, and on October 15, 2013, she reported to Dr. Dalvi that she unilaterally discontinued Dr. Lin's prescribed medications because of perceived side-effects, id. at 718. Accordingly, substantial evidence supports the ALJ's credibility determination because the objective medical evidence and Plaintiff's conservative treatments sufficiently contradicted her subjective representations of pain. Hartline, 605 F. Supp. 2d at 206; Pinkney, 675 F. Supp. 2d at 21. As a result, the undersigned finds that substantial evidence supports the ALJ's RFC determination.

### 3.    The ALJ's Finding that Plaintiff Could Return to Past Relevant Work

The ALJ made another adverse determination at step four, finding that Plaintiff could return to her past work as a mail clerk.  For a claimant to prove that she lacks the capability to perform her past relevant work, she "necessarily must establish what the requirements are of that past work."  Stankiewicz v. Sullivan, 901 F.2d 131, 133 (D.C. Cir. 1990).  According to Plaintiff's testimony, working as a mail clerk required "writing on forms, checking mail, lifting, [and] pulling cages."  AR 34.  In reaching his step-four determination, the ALJ relied on the DOT and the VE's testimony.  Id. at 19.  During the administrative hearing, the VE testified that someone who could perform "a full range of light work," like Plaintiff, could maintain work as a mail clerk, as defined by the DOT.  Id. at 51.  The ALJ further determined that the VE's testimony was consistent with the information contained in the DOT.  Id. at 20; see DOT, No. 209.687-026 (categorizing the occupation of mail clerk as "light work").  Thus, substantial evidence supports the ALJ's finding that Plaintiff could return to working as a mail clerk.[23]

### 4.    The ALJ's Finding that Plaintiff Could Adjust to Other Work

Finally, the Commissioner met her burden to show that jobs existed in significant numbers in the national economy to accommodate Plaintiff's light-work RFC.  See, e.g., Callahan, 786 F. Supp. 2d at 89 (shifting the burden of proof to the Commissioner only for the step-five determination).  At step five, the ALJ must consider "a claimant's [RFC], age, education and work experience to determine whether she can perform other work activity." Davis v. Astrue, 602 F. Supp. 2d 214, 227 (D.D.C. 2009).  At the onset of Plaintiff's alleged

---

[23] The VE also testified that a person who must alternate between sitting and standing positions every thirty minutes could not maintain work as a mail clerk.  AR 51–52.  While the VE represented that Plaintiff could not maintain work as a mail clerk if she also had a "sit/stand" requirement, see id. at 51–52, Plaintiff's RFC did not require alternation between sitting and standing, see id. at 15.  As a result, the sit/stand discussion did not affect the end result.

disability, she was 51 years old with a limited education.  AR 11, 19.  Since Plaintiff is a person

closely approaching advanced age, the SSA must consider that "[her] age along with a severe

impairment(s) . . . may seriously affect [her] ability to adjust to other work."  See 20 C.F.R. §

416.963(d).  Further, Plaintiff's limited education would prevent her from accomplishing "most

of the more complex job duties needed in semi-skilled or skilled jobs."  See id. § 416.964(b)(3).

The ALJ properly relied on the DOT and the VE's testimony that someone with

Plaintiff's characteristics and limitations could find work as an inspector, ticket taker, or grading

and sorting worker.  AR 20, 51.  First, the ALJ appropriately considered Plaintiff's age and

severe impairments in accordance with the relevant authority.  When "assessing a claimant's

ability to do other work, the ALJ must accurately describe the claimant's physical impairments

in any question posed to the" VE.  Butler, 353 F.3d at 1005.  Here, the ALJ's hypothetical

accurately described Plaintiff's age, education, work history, and physical and mental

limitations.  AR 14, 51.

Second, the ALJ's consideration of the VE's testimony regarding the existence of other

jobs available in the national economy was supported by substantial evidence.  See Broyles v.

Astrue, 910 F. Supp. 2d 55, 62 (D.D.C. 2012) ("[I]n determining whether there are jobs which

exist in significant numbers in the national economy that a claimant can perform[,] . . .

an ALJ may consider the testimony of a vocational expert.").  According to the VE, Plaintiff's

RFC, age, education, and work history permitted her to find gainful employment as an inspector,

ticket taker, and grading and sorting worker.  AR 51.  These positions fall within Plaintiff's RFC,

as each constitutes light work, and they account for Plaintiff's limited education level because

each requires only unskilled work.  See 20 C.F.R. §§ 404.1567(b), 416.964(b)(3), 416.968(a);

DOT, Nos. 344.667-010 (ticket taker), 649.687-010 (grading and sorting worker), 741.687-010 (inspector).

In addition, the ALJ "determined that the [VE's] testimony [was] consistent with the information contained in the [DOT]."  AR 20; <u>see</u> <u>Banks v. Astrue</u>, 537 F. Supp. 2d 75, 81 (D.D.C. 2008) (discussing that the ALJ must explain any conflict between the VE's evidence and the DOT before relying on the VE's testimony); <u>see also</u> <u>Callahan</u>, 786 F. Supp. 2d at 90 ("When testifying on whether a claimant can perform jobs that exist in the national economy, the VE may draw from . . . the DOT."). Thus, substantial evidence supports the ALJ's finding that Plaintiff could adjust to other work that was available in the national economy.

**B.      Plaintiff's Additional Evidence Does Not Support Remand**

Plaintiff's second major argument seems to request remand for consideration of the additional medical records which she attached to her pleadings.  See Pl. Mot. at 1; Pl. Reply at 3. A district court may remand disability cases to the Commissioner for consideration of additional medical evidence pursuant to subsection (g) of section 405.  42 U.S.C. § 405(g).  Because it comes from the sixth sentence of that subsection, it is known as "sentence-six remand."  It is appropriate upon a showing that (1) the evidence is new, (2) the evidence is material, and (3) the claimant has good cause for failing to produce that evidence during a prior proceeding.  <u>Id.</u>; <u>see</u> <u>Melkonyan v. Sullivan</u>, 501 U.S. 89, 98 (1991) ("[T]he court remands because new evidence has come to light that was not available to the claimant at the time of the administrative proceeding and that evidence might have changed the outcome of the prior proceeding.").  In the present case, the undersigned finds that sentence-six remand is unwarranted because Plaintiff's additional evidence is redundant and immaterial.

Appendix A

For evidence to be considered new, it must not have been in existence or available to the claimant at the time of the administrative proceeding.  See Jones v. Astrue, 647 F.3d 350, 357–58 (D.C. Cir. 2011).  Satisfying this requirement typically satisfies the "good cause" element as well, since the non-existence or unavailability of evidence constitutes a satisfactory reason for failing to present it.  See id.  The evidence must be dated on or before the ALJ's decision, or, if the evidence post-dates the ALJ's decision, it must reasonably relate back to the time period adjudicated by the ALJ.  Warfield v. Colvin, 134 F. Supp. 3d 11, 17 (D.D.C. 2015).  The evidence cannot show a new or merely worsening condition.  Id.  For new evidence to be material under subsection 405(g), the claimant must show that the evidence could have changed the prior proceeding's outcome.  Jones, 647 F.3d at 358.

### 1.     Plaintiff's Additional Evidence is Not New

Only some of Plaintiff's additional medical records could be considered new within the meaning of the Act.  All of her records post-date the Commissioner's final decision, as the earliest is dated April 23, 2015.  See Pl. Mot. at 5.  Therefore, Plaintiff's evidence neither existed nor could have been available to her during the administrative proceedings.  See Jones, 647 F.3d at 357–58.  By extension, these circumstances also demonstrate Plaintiff's good cause for not presenting this evidence to the ALJ in the proceedings below.  See id.

However, much of her post-dated evidence does not reasonably relate back to the administrative proceedings.  See Warfield, 134 F. Supp. 3d at 17.  Plaintiff's evidence regarding her sleep disorders and depression presents new conditions not raised below, so they cannot be used now to challenge the ALJ's decision.  See id.  By contrast, the additional evidence regarding her spine and right foot could reasonably relate back to the time period during which the ALJ considered evidence regarding Plaintiff's back and right knee.  See Pl. Mot. at 2, 28–29.

Appendix A

Moreover, it is not immediately apparent that this new evidence shows a mere worsening of

Plaintiff's conditions.  See Warfield, 134 F. Supp. 3d at 17; see also Hubbard v. Comm'r of Soc.

Sec., 618 F. App'x 643, 651 (11th Cir. 2015) (post-dated medical records that Plaintiff asserted

to include worsening conditions were not relevant to the issues on appeal, even if they were

dispositive for a subsequent disability benefits claim).  Viewing the evidence generously, the

undersigned will therefore assess the materiality of Plaintiff's additional evidence concerning her

knee and spinal impairments.

> 2.     Plaintiff's Additional Medical Records Are Not Material

Assuming, without deciding, that Plaintiff's new evidence properly relates back to the

previous administrative proceedings, remand remains inappropriate because the evidence is not

material.  See 42 U.S.C. § 405(g); Jones, 647 F.3d at 358.  These records contain no evidence

that would have changed the prior proceeding's outcome.  Jones, 647 F.3d at 358.  Recently, this

Court determined that similarly situated plaintiffs were not entitled to disability benefits even

after submitting new evidence to the court.  See Towers v. Colvin, No. 11–01935 DAR, 2014

WL 5487762, at *6–7 (D.D.C. Oct. 30, 2014); Scott, 839 F. Supp. 2d at 217–18.  In Towers, the

plaintiff attempted to introduce a medical report that was previously unavailable during her

administrative hearing.  Towers, 2014 WL 5487762, at *1.  This report related back to the

administrative proceedings because it discussed symptoms that pre-dated the hearing.  Id. at *6.

The ALJ had decided the plaintiff's case without the report, finding that its inclusion would not

affect the outcome.  Id. at *7.  The Court agreed with the ALJ's findings because the additional

report was "inconsistent with the record and [was] not supported by the evidence."  Id. (internal

quotation marks omitted).  Likewise, the pro se plaintiff in Scott tried to introduce new evidence

in the form of handwritten doctors' notes that restated his medical diagnoses.  Scott, 839 F. Supp.

2d at 217.  The Court found that these notes would not have changed the ALJ's decision because they reflected facts that were already present in the record.  Id. at 218.

On June 25, 2014, the ALJ in this case decided that Plaintiff's impairments failed to equal the two listings found in Appendix 1 of 20 C.F.R. Part 404, Subpart P, and that her RFC allowed both a return to working as a mail clerk and an adjustment to other light work available in the national economy.  AR 14–20.  Plaintiff's new medical evidence must conceivably change at least one of those determinations to be found material.  See Jones, 647 F.3d at 358.  Upon a review of Plaintiff's additional medical records, the undersigned finds no justification for sentence-six remand because her evidence would not alter the ALJ's adverse findings.

### a.      Plaintiff's Impairments Remain Unchanged

First, Plaintiff's additional evidence cannot alter the ALJ's determination that her severe impairments were not equivalent to those listed in Appendix 1.  The ALJ previously compared Plaintiff's existing impairments to listings 1.02 and 1.04, finding neither listing satisfied.  AR 14. As explained above, listing 1.02 requires a showing of impairment in both upper joints.  See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00B2c.  None of Plaintiff's additional medical records pertain to her shoulder impairment, so her conditions still do not meet or equal that listing. Listing 1.02 also requires any impairments to a weight-bearing joint to cause an "extreme limitation of the ability to walk."  See id. § 1.00B2b(1).  Plaintiff's additional medical evidence contains two observations regarding her ability to ambulate:  (1) Dr. Geter observed that she requires a cane to ambulate, Pl. Mot. at 5; and (2) Dr. Weir observed a gradual onset of mild limping, id. at 26.  However, Appendix 1 explains that, when considering assistive devices, an "extreme limitation" in the ability to walk only arises when the claimant requires "a walker, two crutches or two canes[.]"  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00B2b(2) (emphasis added).

None of Plaintiff's additional evidence indicates her use of a second assistive device, so her additional evidence would not disturb the ALJ's step-three findings regarding Plaintiff's weight-bearing joint impairments.  See Towers, 2014 WL 5487762, at *7.

      For Plaintiff's additional evidence to meet or equal listing 1.04, she must first show a compromise to either a nerve root or her spinal cord.  See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04.  Dr. Crowder's spinal exam revealed disc bulging at C4-C5 and C5-C6 and severe neuroforaminal narrowing at C3-C4 through C5-C6, but he could not express definitive findings without an MRI.  Pl. Mot. at 28, 35.  Additionally, Dr. Crowder's spinal exam revealed nerve root irritation on L5 and spondylosis at L4-L5, id. at 10, 12, but there was no finding that these conditions compromised her nerve root or spinal cord.  Dr. Crowder's findings were similar to those of Dr. Akhtar, who opined in 2012 that Plaintiff had "possible nerve irritation in her neck" but did not determine whether that resulted in a compromise of the nerve root or spinal cord.  See AR 713.  If the ALJ did not conclude that Dr. Akhtar's diagnosis satisfied listing 1.04, Dr. Crowder's similar examination would not alter that conclusion.  See Scott, 839 F. Supp. 2d at 218.  Furthermore, again assuming that this evidence establishes compromise of a nerve root or the spinal cord, there is no new evidence establishing that Plaintiff suffers from motor loss, spinal arachnoiditis, or an inability to ambulate effectively.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04A–C.  Therefore, Plaintiff's new evidence provides no basis to disturb the ALJ's conclusions at step three of the disability analysis.

### b.      Plaintiff's RFC Still Permits Her to Perform Light Work

      Plaintiff's new evidence also does not undermine the ALJ's conclusion that her RFC allowed her to return to perform light work.  To determine Plaintiff's RFC, the ALJ relied on objective medical evidence, medical expert opinions, and Plaintiff's representations.  Id. at 19.

In his final decision, the ALJ noted the conservative medical treatments for Plaintiff's impairments, including prescription medication and physical therapy.  Id. at 18.  Similarly, Plaintiff's post-dated treatments included Dr. Geter's NCS, Pl. Mot. at 18, Dr. Kalyanam's NCS and physical therapy recommendation, id. at 9, and Dr. Weir's CT examination of Plaintiff's cervical and lumbar spinal columns, id. at 30.  Though Dr. Geter also recommended surgery, his recommendation was contingent on the results of a future consultation that do not appear in Plaintiff's motion briefs.  Id. at 18.  Accordingly, Plaintiff's additional evidence remains indeterminate and provides no basis to disturb the ALJ's findings that her treatment was conservative.  See Youmans v. Astrue, 856 F. Supp. 2d at 222.

Moreover, nothing in Plaintiff's additional evidence would alter the ALJ's determination about her credibility.  See AR 17.  In his decision below, the ALJ discounted Plaintiff's subjective representations because they were undermined by the objective medical evidence.  Id. at 18–19.  In particular, Plaintiff's testimony regarding her physical limitations was contradicted by the opinions of Drs. Pinder and Hemphill, who independently determined that she could perform light work, and by Plaintiff's conservative treatments.  Id. at 18–19, 71, 80.  An examination of Plaintiff's additional medical records reveals similarly conservative treatments.  As explained above, although Plaintiff was prescribed morphine in April 2014, id. at 724, no medical records from 2015 or 2016 indicate that she continues to take any narcotics or that any of her doctors think she should.  And none of Plaintiff's records contradict the opinions of Drs. Pinder and Hemphill.  Instead, they contain more of Plaintiff's subjective representations of her pain, AR 10, 20, 26, and examination results which the reviewing radiologist conceded could be "more definitive," see id. at 28.  Thus, none of the new evidence undermines the conclusion that Plaintiff retains the RFC to perform light work.  See Jones, 647 F.3d at 358; AR 19.  It simply

reflects the same facts that were present during the earlier administrative proceedings.  See Scott, 839 F. Supp. 2d at 218.

> ### c.    Plaintiff's Capability to Perform Past Relevant Work or Other Available Work Remains Unchanged

Finally, Plaintiff's new evidence does not change the ALJ's conclusions that she could either return to work as a mail clerk or adjust to a similarly demanding job available in the national economy.  In reaching both decisions, the ALJ relied on the DOT and testimony from a VE. AR 19–20.  The VE testified that a hypothetical person with Plaintiff's physical and mental limitations could still return to work as a mail clerk, or, in the alternative, find employment as an inspector, ticket taker, or grading and sorting worker.  Id. at 51.  None of Plaintiff's new evidence alters the requirements for these occupations or challenges the VE's testimony.  Thus, her additional evidence would not change the ALJ's conclusions.  See Jones, 647 F.3d at 358.

 Moreover, Plaintiff's RFC appears to remain unchanged from the ALJ's assessment. Additionally, her education, work experience, and disability onset date have not changed since the ALJ's decision from June 25, 2014.  See AR 19.  Therefore, the new evidence does not contradict the ALJ's determination that Plaintiff could return to her past work or adjust to other light work available in the national economy.  See Jones, 647 F.3d at 358; AR 19.  Accordingly, sentence-six remand is not appropriate in this case.

### CONCLUSION

For the reasons stated above, the undersigned recommends that the Court deny Plaintiff's motion for judgment of reversal and grant Defendant's motion for judgment of affirmance.

*     *     *     *     *

The parties are hereby advised that failure to timely file objections to the findings and recommendations set forth in this report may waive the right of appeal from an order of the

District Court adopting such findings and recommendations.  See Thomas v. Arn, 474 U.S. 140,

154 (1985).


Date:  July 26, 2016                                    _____

                                                       G. MICHAEL HARVEY
                                                       UNITED STATES MAGISTRATE JUDGE